USCA1 Opinion

 

 August 21, 1995 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT No. 94-2164 UNITED STATES FIDELITY & GUARANTY COMPANY, ET AL., Plaintiffs, Appellants, v. BAKER MATERIAL HANDLING CORPORATION, Defendant, Appellee.  __________________ ERRATA SHEET The opinion of this Court, issued August 9, 1995, is amended as follows: Cover sheet: "David A. Berry" in place of "David W. Berry" UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT  ____________________ No. 94-2164 UNITED STATES FIDELITY & GUARANTY COMPANY, et al., Plaintiffs, Appellants, v. BAKER MATERIAL HANDLING CORPORATION, Defendant, Appellee.  ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Richard G. Stearns, U.S. District Judge] ___________________  ____________________ Selya and Cyr, Circuit Judges, ______________ and Schwarzer,* Senior U.S. District Judge. __________________________  ____________________ Michael J. McCormack, with whom Marc LaCasse and McCormack & _____________________ ____________ ____________ Epstein were on brief for appellants. _______ David W. Barry, with whom William L. Boesch and Sugarman, Rogers, ______________ _________________ _________________ Barshak & Cohen, P.C. were on brief for appellee. _____________________  ____________________ August 9, 1995  ____________________  ____________________ *Of the Northern District of California, sitting by designation. CYR, Circuit Judge. Plaintiffs United States Fidelity CYR, Circuit Judge. _____________ & Guaranty Company ("USF&G")1 and Jennifer Chapman, administra- trix of the estate of Russell M. Chapman, Jr. ("Chapman"), challenge district court rulings precluding their introduction of certain evidence at trial and denying their motion for new trial or relief from judgment in a wrongful death action against defendant-appellee Baker Material Handling Corporation ("Baker"). We affirm.  I I BACKGROUND BACKGROUND __________ On January 5, 1990, Chapman sustained fatal injuries in a phenomenon known as "rack underride" when he was crushed between a warehouse shelf and the back of the 1979 Baker Moto- Truck model XTR forklift ("XTR") which he was operating. The XTR was discontinued later in 1990 and replaced by the Baker Reach Truck forklift ("BRT"), first manufactured in 1987. Unlike its predecessor, the BRT-design repositioned the steering controls and incorporated vertical rear posts to protect the operator.  Following Chapman's death, USF&G and Jennifer Chapman ("appellants") brought suit in Massachusetts Superior Court, claiming that 1) Baker had breached its duty to warn Chapman's employer of the danger of "rack underride"; and (2) the lack of vertical rear posts in the XTR (i) violated the implied warranty of merchantability and (ii) rendered the XTR-design unreasonably  ____________________ 1USF&G is the workers' compensation insurance carrier for Chapman's employer. 3 dangerous. Following the removal of the action to federal court, see 28 U.S.C. 1332, 1441(a), Baker responded in the negative ___ to interrogatories designed to disclose whether it had ever been sued for damages arising out of a similar XTR incident and whether it had ever modified an XTR forklift by installing vertical rear posts. Approximately two years later, shortly before trial, Baker again responded in the negative to similar supplemental interrogatories.  As Baker now concedes, its responses were materially incorrect. It had installed vertical rear posts in two XTRs for Boston Edison in 1987, and later that year sold Boston Edison two new XTRs with vertical rear posts. And, for good measure, Baker had been sued in 1985 based on a similar XTR "rack underride" claim which settled in 1989. See DeMarzo v. Baker Material ___ _______ ______________ Handling Corp, No. 477122 (Orange Cty. Sup. Ct. filed Dec. 20, ______________ 1985) ("DeMarzo").  _______ Baker filed a motion in limine to preclude evidence of __ ______ its incorporation of vertical rear posts in the BRT-design, asserting lack of relevance and undue prejudice, see Fed. R. ___ Evid. 402, 403. It contended that incorporating posts in the earlier XTR-design would have impeded steering, as well as safe ___ egress by the operator in the event of a crash or rollover. On the other hand, its repositioning of the steering controls in the BRT-design had alleviated the operational impediment and hazard ___ associated with incorporating posts in its XTR-design. Conse- ___ quently, urged Baker, the BRT-design would be irrelevant to the 4 determination whether the absence of vertical rear posts in the XTR-design created an unreasonably dangerous condition. The motion in limine was granted on the eve of trial.  __ ______ At trial, Baker incorrectly represented in its opening statement that the evidence would show that the XTR had never been involved in a "rack underride" accident and that Baker had never installed vertical rear posts in an XTR. Although appel- lants had already learned about the 1985 DeMarzo XTR litigation _______ and Baker's undisclosed XTR modifications, they neither alerted the district court nor mentioned these matters in their opening statement.  During trial, appellants elicited from Manfred Baumann, Baker's vice-president for engineering and the officer in charge of litigation, that company files contained no record of any prior "rack underride" incident involving the XTR forklift and that Baker had never installed vertical rear posts in an XTR, though it was in fact feasible to do so. Whereupon appellants confronted Baumann with depositions taken in the DeMarzo litiga- _______ tion, and with Boston Edison records, indicating that Baumann's testimony on both points was inaccurate, as Baumann was forced to concede.2  ____________________ 2According to Baumann, the DeMarzo litigation file had not _______ been entered on the master-file list until after Baker responded to the initial interrogatories, and the information relating to the XTR modifications made by Baker at the request of Boston Edison had been placed in the Boston Edison client sales file, rather than the XTR file. He testified that there were more than 100,000 client sales files, and that it was not until he had been told of the modifications to the Boston Edison XTRs that he had searched its client sales file. Further, Baumann admitted that 5 Notwithstanding their denudation of Baker's discovery lapses, appellants elected not to request sanctions or a continu- ance to pursue further discovery, choosing instead to capitalize on Baker's "cover-up" in their closing argument. Apparently unimpressed, the jury found for Baker on all three theories of liability; judgment entered; and appellants moved for a new trial, see Fed. R. Civ. P. 59(a), or for relief from judgment, ___ id. 60(b)(3), alleging prejudice from the order precluding their ___ BRT-design evidence and from Baker's responses to interrogato- ries.  On appeal, appellants attack the district court judg- ment, asserting reversible error in the ruling precluding their BRT-design evidence. Their discovery abuse claim forms the basis for the appeal from the denial of their postjudgment motion. Appellants speculate that they were unfairly prejudiced by the inaccurate responses to interrogatories, notwithstanding their decision not to request Rule 37 relief, since it is impossible to determine what would have been disclosed in full discovery.  II II DISCUSSION DISCUSSION __________ A. Appeal from the Judgment A. Appeal from the Judgment ________________________ The district court order precluding the BRT-design evidence is reviewed for abuse of discretion. Espeaignnette v. _____________  ____________________ Baker's responses to the initial interrogatories had been inaccu- rate and that he had not reexamined the Baker litigation files before responding to the supplemental interrogatories.  6 Gene Tierney Co., Inc., 43 F.3d 1, 5 (1st Cir. 1994) ("'Only _______________________ rarely -- and in extraordinarily compelling circumstances -- will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect.'" Freeman v. Package Mach. _______ _____________ Co., 865 F.2d 1331, 1340 (1st Cir. 1988). Notwithstanding this ___ deferential standard of review, the Espeaignnette panel reversed _____________ a similar ruling, Espeaignnette, 43 F.3d at 8-9, where the issue _____________ was whether a lawn-edger design, which made no provision for a protective guard over the cutting blade, was unreasonably danger- ous. Id. at 4. The defendant-manufacturer conceded that it ___ would be feasible to attach a protective guard, but maintained that normal operation of the edger would be impeded. Id. at 6. ___ The district court precluded evidence that a third party had made a business of attaching protective guards to the identical lawn edger model, even though the evidence showed that the modifica- tion at issue was "both possible and practical". Id. The ___ Espeaignnette panel reversed on the ground that the proffered _____________ modification evidence was highly probative and entailed no unfair prejudice because, if credited, it directly controverted the defendant-manufacturer's claim that the proposed modification would impede normal edger functioning. Id. at 6-8.  ___ The superficial similarities between Espeaignnette and _____________ the instant case are outweighed by more fundamental dissimilari- ties. First, both cases implicate Rule 403 rather than Rule 407, though for different reasons. Espeaignnette noted that Rule 407 _____________ 7 has no application to third-party modifications, id. at 7; see ___ ___ also Raymond v. Raymond Corp., 938 F.2d 1518, 1524-25 (1st Cir. ____ _______ ______________ 1991) (Rule 407 applies only to subsequent remedial measures by manufacturer, not by third parties), whereas Rule 407 does not apply to the instant case because the BRT-design modification preceded Chapman's accident. See id. at 1523-24 (Rule 407 does ___ ___ not apply to design modifications made prior to accident in litigation) (upholding exclusion under Rule 403). Second, the modification in Espeaignnette had been performed on an edger _____________ identical to the one which injured the plaintiff, Espeaignnette, _____________ 43 F.3d at 6, whereas the modification in the instant case was made to the BRT-design, which was substantially dissimilar to the XTR which injured Chapman. See also infra p. 8.  ___ ____ _____ The district court found that the BRT was not suffi- ciently similar to the XTR, a finding we review only for clear error. Cameron v. Otto Bock Orthopedic Indus., Inc., 43 F.3d 14, _______ _________________________________ 16 (1st Cir. 1994) (findings of fact integral to evidentiary rulings are reviewed for clear error). Its finding is amply supported. Appellants' own expert testified that vertical rear posts could not practicably be incorporated in the XTR unless it underwent major redesign. Whereas the record revealed that the BRT-design could accommodate vertical rear posts precisely because its steering controls had been repositioned in the operator's cabin so that the posts would not interfere with steering.  The Raymond case, supra, provides sturdy support for _______ _____ 8 the district court ruling.3 It involved a claim that a side- loader design was defective for lack of vertical rear posts. Raymond, 938 F.2d at 1522. The decedent had been fatally injured _______ by a beam which penetrated the sideloader operator's cabin, id. ___ at 1520, and the district court excluded evidence that rear posts were included in a later design that predated the accident. Id. ___ at 1522-23. We upheld the exclusionary ruling, with the follow- ing explanation: "the introduction of evidence of pre-accident design modifications not made effective until after the manufac- ture of the allegedly defective product may reasonably be found unfairly prejudicial to the defendant and misleading to the jury for determining the question whether the product was unreasonably dangerous at the time of manufacture and sale." Id. at 1524. The ___ Raymond logic is no less apt in this case.  _______ Finally, the evidence excluded in the instant case was by no means the most probative available on the ultimate jury issue; viz., whether the XTR-design should have included vertical rear posts. Whereas the best evidence relating to the safety and practicality considerations involved in Espeaignnette had been _____________ that a third party was making a business of incorporating a protective guard on the identical edger, the best evidence that the XTR could accommodate vertical rear posts was the uncontro- ___ _____ ___________ verted proof presented to the jury that Baker in fact had  ____________________ 3Although Raymond involved New Hampshire law, 938 F.2d at _______ 1520, we recently held that its logic applies as well to "design defect" and "failure to warn" claims under Massachusetts law. Cameron, 43 F.3d at 18.  _______ 9 installed posts in the XTRs it modified at Boston Edison's request. The evidence that posts had been installed in XTRs diminished not only the need to establish their incorporation in the noncomparable BRT-design, but any unfair prejudice from its exclusion. Thus, the district court did not abuse its discretion in concluding that the required Rule 403 balancing tipped deci- sively in favor of preclusion. Espeaignnette, 43 F.3d at 6 _____________ (centrality of disputed evidence to party's claim is strong factor in Rule 403 balancing test) (collecting cases).  B. Appeal from the Denial of Postjudgment Relief B. Appeal from the Denial of Postjudgment Relief _____________________________________________ We review orders disallowing postjudgment relief under rules 59 and 60(b)(3) for abuse of discretion. Perdoni _______ Bros., Inc. v. Concrete Systems, Inc., 35 F.3d 1, 5 n.5 (1st Cir. ___________ ______________________ 1995) (Rule 59); Fernandez v. Leonard, 963 F.2d 459, 468 (1st _________ _______ Cir. 1992) (Rule 59 and Rule 60(b)(3)); United States v. Parcel _____________ ______ of Land & Res. at 18 Oakwood Street, 958 F.2d 1, 5 (1st Cir. ______________________________________ 1992) (Rule 60(b)(3)). The district court rulings that Baker's inaccurate responses to interrogatories neither constituted fraud nor resulted in substantial interference with the preparation and presentation of appellants' case are reviewed for clear error. Anderson v. Beatrice Foods, Co., 900 F.2d 388, 392 (1st Cir.), ________ ___________________ cert. denied, 498 U.S. 891 (1990). _____ ______ Appellants argue that the district court abused its discretion by not affording them postjudgment relief based on Baker's slipshod and misleading responses to interrogatories, 10 which denied them a fair trial.4 Among the available forms of relief from prejudice occasioned by discovery violations are curative measures such as continuances and stays pending compli- ance, orders tailored to effect issue preclusion, contempt orders, and default judgments. See R.W. Int'l Corp. v. Welch ___ _________________ _____ Foods, Inc., 937 F.2d 11, 15-20 (1st Cir. 1991) (discussing ____________ grounds for Rule 37 sanctions); Fed. R. Civ. P. 37(b)(2),(3).  Appellants' claim fails, nonetheless, as they opted to proceed rather than request relief under Rule 37, presumably because the information Baker did not disclose had become known to appellants before or during trial. Moreover, though their gambit proved unsuccessful, there was both method potential advantage in their stratagem and little to lose. Since there is even now no concrete suggestion that further discovery would have benefited them, their prospects for obtaining Rule 37 relief appear all along to have been minimal compared with the potential jury impact their "cover-up" claim might reasonably have been expected to occasion. Thus, appellants' decision to use their hole card in an abortive gambit with the jury plainly waived any claim that their decision to forego Rule 37 relief rendered the trial unfair. The appropriate remedy for parties  ____________________ 4Appellants rely on Anderson v. Cryovac, Inc., 862 F.2d 910, ________ _____________ 923 (1st Cir. 1988), for their contention that a district court may grant relief from judgment and a new trial even if the failure to provide requested discovery was inadvertent. Follow- ing our remand in Cryovac, the district court denied relief from _______ judgment under Rule 60(b) notwithstanding its finding of deliber- ________ ate discovery abuse. We nevertheless upheld its ruling. Beatri- ___ _______ ce Foods Co., 900 F.2d at 391-92.  ____________ 11 who uncover discovery violations is "not to seek reversal after an unfavorable verdict but a request for continuance at the time the surprise occurs." Szeliga v. General Motors Corp., 728 F.2d _______ ____________________ 566, 568 (1st Cir. 1984); see United States v. Diaz-Villafane, ___ _____________ ______________ 874 F.2d 43, 47 (1st Cir.) (criminal case), cert. denied, 493 _____ ______ U.S. 862 (1989). Here, of course, there appears to have been no genuine surprise. Nor can appellants plausibly suggest that the district court abused its discretion by declining their post- judgment motion for relief from the unwelcome consequences of their calculated decision. Ojeda-Toro v. Rivera-Mendez, 853 F.2d __________ _____________ 25, 29 (1st Cir. 1988) ("[A] party may not prevail on a Rule 60(b)(3) motion . . . where [it] has access to disputed informa- tion or has knowledge of inaccuracies in an opponent's represen- tations at the time of the alleged misconduct.") (collecting cases).  III III CONCLUSION CONCLUSION __________ As the district court did not abuse its discretion in precluding the dissimilar BRT-design evidence nor in denying postjudgment relief under Rules 59 and 60(b)(3), its judgment is affirmed.  ________ 12